Our third case is No. 22-11752, Bluhm v. Wyndham Vacation Ownership. Mr. Byrd, whenever you're ready. Thank you, Your Honor. May it please the Court, much of the outcome of this case, which is seeking, asking the Court to reverse the summary judgment against my client, depends upon one fundamental question. What is commercial conduct? Is it one of those things that can't be defined, but you know it when you see it? Does it carry a universally prescribed meaning? Or, as we submit, is the phrase susceptible to so many different and irreconcilable meanings that it becomes hopelessly ambiguous? All right, let me ask you this question. I understand the argument about commercial conduct and the potential ambiguity of that term. But the agreement and release isn't limited to that term. The language is, this is paragraph 4, Owners agree not to engage in any commercial conduct of any type as part of their use of the retained interest, comma, which would include the use of extra holidays or any other Wyndham-related entity for the rental of owner's retained interest. Additionally, owners agree not to directly or indirectly acquire in the future any timeshare interest or any interest in account with Wyndham, et cetera, et cetera, either from Wyndham or a third party or own or control any timeshare interest with Wyndham or affiliated entities by controlling any ownership interest in the future with the exception of the retained interest as defined here. So this is not commercial conduct in a vacuum. It's commercial conduct plus a lot of including language. How does that not cause a problem for your position? Well, the commercial conduct is a primary predicate upon which the whole limitation is structured. If you look at what they were talking about and what they challenged was using the extra holidays program at all, according to the judge, which they say was the offending conduct that my client committed. And we submit Did he do that put him in potential breach? Well, what he did really was that he engaged in the extra holidays program, which they permitted, which Mr. Muscara admitted he believed he could use up to 50 percent of his interest, as they call it, or units or points, that they allowed him to do it both before the agreement and after the agreement. So there's no question that He kept acquiring timeshare interest and then renting them out through the program. Well, he at least acquired two, which they consented to, by the way. What was the alleged breach as Wyndham saw things? That he was using the timeshare units interest in the extra holidays program, which they claim for commercial conduct, which brings us back full circle. What is commercial conduct? Judge, there are at least four different meanings. This is in the record, Mr. Bloom's interpretation. But the including clause that I read to you says, which would include the use of extra holidays or any other Wyndham related entity for the rental of owners retained interest. How is that not clear? It's certainly commercial conduct could incorporate those elements. For example. No, it tells you that it does. No, what it's saying is that that is an example of what commercial conduct could be. And isn't that isn't that what he's alleged to have done? They allege he did. But you have to understand. Well, what is it? What is commercial conduct? According to the course rule, any agrees not to do these things. It's not just a definition. It's an agreement of owner agrees not to engage. And then it says, which would include which means this is the activity. It's not limited, by the way. But it includes this kind of activity. You're not allowed to engage in that if you're the owner. But, see, you still have to answer the question, what is the thing that he's not allowed to do? The predicate he's not allowed to do is commercial. He's not allowed to rent. Not to do commercial activity like that. We would argue, we think the documents means, and this is the way they themselves interpret it. You cannot use the extra holidays program for commercial conduct. They didn't say you can't put interest and sell them or rent them in the extra holidays program. It says, I mean, do you have the document in front of you? Yes, sir, I do. Okay. I mean, maybe we're just looking at this very, very differently, and if we are, that's okay. Owners agree not to engage in any commercial conduct of any type. If it stopped there, I could understand your argument about ambiguity of what commercial conduct means. But now it says, which would include the use of the extra holidays or any other Wyndham-related entity for the rental of owner's retained interest? So you can't rent your retained interest. What am I missing? Well, what you're missing, Judge, respectfully, is you're saying that all extra holidays usage is commercial conduct. We think that's looking at it in reverse. Certainly, commercial conduct could be, could incorporate the extra holidays program. And we know this. We know this distinction because Mr. Mascara, when he was asked, well, what exactly does that mean? He says you can't use, he had a couple of different interpretations. One was that no more than 50% of your rental activity can be put in the extra holidays program. Well, we know that didn't happen. Plus, he said that it could be used for leftover points, whatever that means. What is your definition of commercial conduct then or commercial use? It depends on which of the many parties you want to ask. I think commercial conduct, in Mr. Bloom's mind, was very simple. Don't advertise or promote and curtail the level of your activity. Therein lies the problem. Everybody had a different interpretation, starting with Mr. Bloom. Even under your interpretation, I guess, what disputes of fact are there in the record that would warrant a trial? Isn't it the case that he undisputedly engaged in for-profit activities, renting these timeshare units? Why wouldn't that, even assuming you can interpret the term commercial use more broadly or more early perhaps, isn't on this record still the case that there are no genuine issues of material fact that he breached that promise? Well, there's no question that he rented some of the units in the program. But the question is, is that offending conduct or not? And that depends, again, on what is commercial conduct? Now, the trial court judge tried to put a finer point on it by saying, first she said no financial gain. Well, what does that mean? Because the Extra Holiday Programs is designed, it's permitted, it's allowed. It may even allow Mr. Bloom to participate to make money to offset expenses. But she said, well, you can't make a profit. Well, what does profit mean? When do you measure profit? How do you measure profit? What goes into a profit determination? Do you factor in the amount of the assessments? Do you factor in the debt he has on a unit? And therein lies the problem. Everybody had a different interpretation. So one of two things happens. Either the agreement is so ambiguous that the court should have at least heard the case. And what the court did instead is said, look, the court imposed a prohibition on the Extra Holiday Program. You cannot rent at all. Well, we know it's not true. We know it's not true what they did before. We know it's not true what Mr. Mascara, who is the point person on the deal, we know it's not true about how they allowed him to buy more units and to put them in the Extra Holidays Program. And therein lies the problem. This slope, when you try to get into a judge and say, well, what exactly is commercial conduct? Honestly, they chose the term. It's their document. It's susceptible to so many different meanings. It fails for the classic void for vagueness. But the issue I'm having, and I speak for myself only, is that this is not a document that is, let's say, you purchase a condominium and this is a declaration that you have no control over. This is a settlement agreement and release that I assume was negotiated because you were on the verge of going to trial. So this is a settlement agreement that is reached by the parties. With all due respect, this was a settlement agreement entered before the lawsuits were filed. This was conduct that preceded all of the lawsuits. This is not in the context of active litigation. And, of course, therein lies the problem. There was the fraudulent inducement which sort of led to the whole thing. Mr. Miscaris says, and I think the trial court had it fundamentally wrong, he said the system doesn't work. You have too many points in the system. That's not true. In fact, we know it's not true because he later admitted with a push of the button, you could unblock the account. Therein lies the fraudulent inducement. To use a phrase my grandmother taught me, Mr. Bloom was hornswoggled. He was misled about what the reason was for the agreement. They entered into the agreement. Then later they came back and claimed that he was in violation of the agreement because he was selling units in the extra holidays program. That's not prohibited. Commercial conduct is prohibited. That's not what was going on here. And, of course, in order to answer that question. How do you define or what does this clause mean which would include the use of extra holidays for the rental of owner's retained interest? What does that mean? Well, what that means is you cannot engage in commercial conduct that would go through that process. Let me put it another way, Judge. What does rental mean? Rental means you're selling the unit to it. Basically what you do is you take your points, you get a reservation, you put it in the system, they sell the reservation to a third party, the money comes in, Wyndham gets 40% of the money, my client gets 60% of the money. The whole system is this. So that's what he can't do? No. He can't engage in commercial conduct. Which includes the rental of owner's retained interest. No. The extra holidays does not define commercial conduct. Commercial conduct could include extra holidays. Judge, no one would say, and I would ask that even Wyndham would say this, no person would say that the extra holidays program per se is commercial conduct. They allow it across the board. The question is can you engage in commercial conduct? Whatever that is, it's so ill-defined and undefined. I don't think anybody knows. My client thought it meant one thing. Mr. Mascara thought it meant another thing. The trial judge came up with her own interpretation, which is this absolute prohibition, and that's not a position anybody has ever taken until the trial court. I know I'm over, Your Honor. I've saved the balance of my time for rebuttal. Thank you. Thank you very much. Ms. Turner. Good morning. May it please the Court. Sarah Turner here on behalf of the Appellees, the Wyndham entities. Collectively, I'll refer to them as Wyndham, even though they are distinct entities that each have different contractual roles here as to the underlying contracts. With respect to the settlement agreement, which is what's before the Court today, they are all included, as are any other related Wyndham entities. The issue before the Court on appeal, as the appellant has framed it, is whether or not the Court appropriately shifted the burden onto Mr. Bloom with respect to having to prove affirmative defenses related to his release. But as the Court has already identified, the one issue that Mr. Bloom focuses the majority of his brief on relates to the definition of commercial use. Commercial conduct. Commercial conduct is the actual language that's in the settlement agreement. But that phrase and that concept, as the district court defined it, relates to for-profit activity, activity that was intended to earn a profit. As I read the contract, the agreement, he, unlike any other Wyndham owner, is not allowed to rent his property anymore to third parties? I don't think that that is a fair reading of the agreement. Okay, so you tell me how Paragraph 4 operates. Sure. So I think when you look at all of the contracts that have been entered into between the various parties, this concept of commercial use, commercial activity, and for-profit use is contained in almost every one. And in every one, it has the same meaning, which is that a party is not allowed to engage in for-profit activity. This is not intended to be used as an investment vehicle. It's not intended to be used as a vehicle by which you are attempting to run a business or earn a profit. And if you look at the Black's Law Dictionary that has been cited by Mr. Bloom in his final brief, the only definition that he cites, too, is the word commercial. He doesn't cite to commercial activity. He doesn't cite the Court to commercial use. And that's because when you look at those definitions, they are consistent, as are the majority of the definitions of the word commercial, with the way that this term is used in all of the agreements between these parties. At some point, Wyndham allowed people like Mr. Bloom to use his timeshare interest to make a profit, right? I would say that... I mean, the record's pretty clear about that. I would say that Mr. Bloom got away with doing that. I'm not sure that he was allowed to do it. I mean, Wyndham was getting the payments from the third parties, right? And they were forwarding the payments to Mr. Bloom, right? I think as it relates to extra holidays and his use of extra holidays, that's true. You can't say that he got away with it if Wyndham was participating. After all, Wyndham was getting 40%, whatever that may have been, or whatever percentage it was. I think that's true as to extra holidays, Wyndham, that he was permitted to have an excessive use that was clearly being done for profit. Forget excessive. If I had one timeshare interest with Wyndham and I had points to rent a timeshare in Maui, could I then put that property for a weekend on the market and have a third party rent it, pay Wyndham the sum that was agreed upon, and then I get the 60% and Wyndham gets 40%? Through the extra holidays program? Yes. I can do that today? Yes. Then tell me what Mr. Bloom is allowed to do under Paragraph 4. Because Paragraph 4 says that he agrees that he's not going to engage in commercial conduct of any type, which includes the use of the extra holidays for the rental of owner's retained interest. What does that mean? There's a problem, right? I mean, if you look at the extra holidays listing agreement, I think that those are clear, that if you have timeshare that you have purchased for your personal use, that you cannot use. I just asked you if I just did the same thing and you told me I could do it. And I think Mr. Bloom can do that even under the terms. So what is he prohibited from doing under Paragraph 4? From running a profit-driven business whereby he is essentially using. Now you're running into a big problem because now you're adding ambiguity to what I thought was clear in Paragraph 4. I thought Paragraph 4 was clear because it barred him completely from doing this. It says no commercial conduct of any type, including the use of extra holidays for the rental of owner's retained interest. That's a flat-out prohibition. And it may be that that is what the agreement. You can't dodge like that. You have to tell me what that means. If you're telling me that there's wiggle room, now I'm starting to see where the problem is. I think that it's clear in the course and scope of the party's conduct as well as all of the agreements. Okay, what is he allowed to do? That owners are allowed to rent their ownership by entering into agreements through extra holidays. So long as they are doing it in a way that isn't commercial use. What does that mean? They are not trying to earn a profit. So you have to do it in a way that calibrates your cost with the rental that you're charging. So if you break even, you're good. But if you're over by a penny, you're in violation of the agreement. I think it's the intent behind the use. You have now thrown this into a complete mess. Can I ask a question? Because I'm actually confused. So when you go into Exhibit 1, which is the purchased interest, the term sheet, I guess, right? So explain to me what are purchased interests versus retained interest, which is a retained interest. He identifies it as owner shall retain and be entitled to use the timeshare interest identified in Exhibit 2, which is the retained interest. So explain to me what this means. A purchased interest would have been the interest that he originally purchased and owned either directly from my clients or on the resale market. The retained interest is simply a defined term under the settlement agreement that refers to the limited number of interests that he was allowed to retain as part of this settlement agreement. And if you read the correspondence between the parties, the reason that he was allowed to retain a small number of interests was for his personal use. So what do the points then mean on this Exhibit 2? I apologize. I didn't hear. In Exhibit 2, it has retained interest, and it's one, two, three, four properties, right? And then it also has lists of points. What do the points mean?  So when an individual, a consumer, purchases a timeshare interest, they have the ability voluntarily to assign the use rights from that interest into a trust. The trust allows that individual the opportunity to use their timeshare interest at more than just the location where they actually own a real estate interest. And so when they assign the use rights, in exchange for that, they get a certain number of points. And they get to use this reservation system to rent at other locations. And the points are really just a fictional way to describe the real estate interest that they use. If an owner decides they don't want to assign their rights, their use rights, into this trust, they can just use their timeshare at the location that they actually own their real estate interest, in a more traditional sense, as you would think of timeshare. How did Mr. Bloom breach, according to Wyndham, the agreement and release? Certainly. Well, I mean, there's a number of ways that he breached. Number one, he purchased additional contracts, right? And to say that we approved those, I think, is disingenuous. There was a deeding department that affirmed that the deed was clear, but there was no approval. In fact, there's communication saying that, you know, we've discovered that you've made additional purchases. But in terms of his use, we know that he was excessively using extra holidays, meaning that he wasn't using his timeshare for his personal use, or he wasn't, on the rare occasion that he couldn't use his timeshare for his personal use, going to extra holidays to, you know, cover his costs. He was actually going back to what he had been doing before, which is running a for-profit business. And we know he was doing that, and he admits that he was doing that, because those are the allegations in the underlying lawsuit. He was seeking millions of dollars from my client in lost profits because he said that I had been running a for-profit business  No, no, I know that, but I'm saying after the settlement agreement was entered into, how did he breach according to Wyndham? You told me number one, he acquired new interest without Wyndham approval, right? Correct. Okay, what's number two? Number two, he... Post-agreement. Yeah, he violated the confidentiality provision, which he stipulated to, and there's a judgment in the record. Okay, that's two. And then third, he engaged in commercial use, meaning that he was running... He had what? He was running a for-profit commercial business with his timeshare, as opposed to using it personally for himself. You told me at the very beginning that if I purchased a Wyndham timeshare, I could rent it out to a third party using my interest. Under the terms of those contracts, which those contracts are clear, when you enter into a listing agreement with Extra Holidays, that you're doing so simply because you weren't able to use it for your personal use. It's a last resort. So I just want to clarify. So basically what you're saying is that if I have a timeshare and I can't use it, because a timeshare normally, you only have it certain weeks out of the year, right? Correct. So if for some reason that week out of the year, two weeks out of the year that I'm going to use the timeshare in Maui, I have something to do, then you could put it back in so you don't lose, I guess, what your... Do you get some money from it? What do you get out of this? So under the more modern system, which is really what we're talking about here, and as it applies to Mr. Bloom, he has signed his use rights into the trust, so he has points instead of a specific week that he has to use. But if at the end of his use year comes up and he isn't going to be able to use his timeshare that year, his mother passed away or he has some conflict, he can't use it himself, he can enter into a listing agreement with Extra Holidays by which Extra Holidays will agree to list his timeshare for him on the resale market, on the public market, and it may or may not rent to another third party. If it does rent, then Extra Holidays gets a cut of that rental and Mr. Bloom would get a cut of that rental. But that amount isn't intended to create some sort of a profitable business. Extra Holidays isn't set up to be a business entity supporting people running independent commercial enterprises. Extra Holidays is intended simply as a benefit for owners who maybe can't use, so they don't lose the money on the maintenance fees they're going to have to pay in a given year. Let me ask you a dumb question. After the agreement and release are entered into, if he is trying to use the Extra Holidays to, as you say, engage in a for-profit enterprise again, why is Wyndham letting him do it? I mean, you just signed an agreement with him because of what you thought was excessive use and the turning of the ownership of timeshare interest into a for-profit enterprise, right? But you find out, allegedly, that soon after entering into the agreement, he's back up to his old tricks and he's trying to use the Extra Holidays program to put properties out on the market and rent them so that he gets money after Wyndham takes a cut. Why would let Wyndham participate in that? Wyndham didn't. They sent him an email saying, hey, we have noticed. And how could he make any money if Wyndham refused to list the properties? I thought you said that it was Wyndham, through the trust, that lists the property for him under Extra Holidays. Extra Holidays is a separate entity that lists the properties. But when Wyndham discovered that this is what he was doing, that he was using Extra Holidays in a way that was not intended under the settlement agreement, Wyndham sent him an email and said, hey, we've noticed, number one, that you've acquired additional interests and we've noticed that you are using Extra Holidays in a way that is inconsistent with the settlement agreement, meaning you are not just using it on the rare occasion that you personally can't use your timeshare. You're using it for the majority of your timeshare consistently or more than 50% consistently, and we've discovered you're essentially running a commercial rental business again, and we think you're in violation of the agreement. See, I thought this was really easy because I thought that paragraph number four, given the past history between the parties, just simply barred him from using the Extra Holidays program to rent his timeshare interest. But now you're telling me that's not the case. You're telling me that there's now a for-profit definition somewhere in there that I cannot read. Well, the Extra Holidays agreements themselves are in the record, and they do also bar commercial use and set out the terms by which an individual is supposed to use it. But if you're engaging in this rental to third parties and you're just trying to break even, is that not commercial conduct? It's just not for-profit, but it's commercial conduct, is it not? I don't think it is under the definition of commercial either, under Black Claw. Where's commercial? There are a lot of companies that engage in activities that don't lead to a profit, either because the product is not good or the economy is not doing well or the strategy didn't pan out. It's still commercial conduct. Whether Mr. Bloom was ultimately profitable or successful at his business enterprise is irrelevant. What was the intent behind his use? Was he using Extra Holidays in a way that it was intended, meaning on the rare occasion to simply break even, or was he running a commercial enterprise? There's nothing about intent here. Now you're putting a subjective state-of-mind element into paragraph 4. There's nothing in the text that says anything about state-of-mind or intent. I think what this ultimately draws back to is if you look at the underlying agreements, the purchase agreements, the assignment agreements, the listing agreements, all of them talk about commercial use and not using timeshare as an investment vehicle, and that really stems back to each and every state's timeshare laws which require and prohibit timeshare from being used as an investment vehicle. Why did you use the words investment vehicle instead of commercial conduct? Those words are used in a variety of the contractual agreements between the parties which were ratified by Mr. Bloom's continued use of the reservations. He's asking why didn't you use it in the settlement agreement, but I guess my underlying question is, in order for us to determine that you're not supposed to use the extra holidays in a manner that would be for profit, you then really have to look at the underlying agreements for the timeshare properties. I don't think so because of the conversations that are being had in writing leading up to the settlement agreement where it is clear... I understand that, but the settlement agreement says specifically on page 8 that this is the entire agreement, paragraph 18. Each party acknowledges and agrees that no representations or promises have been relied upon. All prior representation and promises made by any party, whether in writing, orally, or understood by the parties, we merge into this agreement. I mean, you could have had a provision in here that referenced all the underlying documents. Is there one in there? I believe the agreement also says that Mr. Bloom is required to continue to abide by the program rules and agreements of parties. That is in future conduct on paragraph 7. Owner acknowledges and agrees to abide by the rules and regulations of all programs. So, again, I'm going to ask again, is there something in the record, an agreement, that's a rule of regulation of all programs that says to us that you are not allowed to engage in a for-profit business, that you cannot use all your interests, that I can't put it on the market to make money? Certainly. The program rules, which are also in the record, and are also incorporated by reference into the individual contracts that were signed. Were they in the record? No, but I can find that out. Were they filed as part of your summary judgment motion? Yes, I believe they were. I know that I'm well over my time, and so if I could just, the definition of commercial and commercial activity is something that is not only included in all of the contractual agreements between the parties, but it also, every time you look up the definition of commercial activity in any location, anywhere, it includes the word profit. And that is because that is the crux of the meaning of that word, and that is the prohibition that we are trying to enforce here. And this settlement agreement wasn't intended to be a change in the rules that individual owners have to abide by. They are not allowed to engage in a commercial enterprise for profit under the timeshare system. Can non-profit entities engage in commercial conduct under your definition? If you have a hospital that's a not-for-profit entity, does that entity engage in commercial conduct when it advertises? I don't, not within the context of... Does it engage in commercial conduct when it purchases additional property?  No, no, this is a completely different set of facts. I don't think advertising... You said commercial conduct. Yeah, I don't think... Is profit-related. And so my question to you is, does an entity that is not-for-profit, say a hospital, engage in commercial conduct when it purchases advertising or buys a new piece of property on which to build? Is it engaging in commercial conduct even though it's a not-for-profit entity? Under the definition of commercial conduct, as it is intended to be used here and is used in all of the agreements between the parties, I don't think advertising, first of all, I don't think that has anything to do with it. I think it is the intent of the rental or the intent of the use and whether or not it is intended to earn a profit. Whether or not that profit is to be used for a non-profit purpose, meaning an altruistic purpose, or whether or not that profit is to be used for one's self. So although you're buying advertising and paying an advertising entity for its services in creating an ad and putting it up and distributing it, or you're paying a landowner money for his or her or its property, that's not commercial? I don't think it matters where the profit is going, whether or not the profit is going for an altruistic purpose, meaning through a non-profit entity, or whether or not you are pocketing the profit yourself. I don't think that is the distinguishing factor of the word commercial. I think commercial activity is focused on whether or not the purpose of the activity is to create a profit. However that profit ultimately is distributed, I think is irrelevant to the definition of commercial. Okay. Thank you very much. Thank you so much. I appreciate your time. Your Honor, Wyndham did exactly what I predicted they would do. They would never step before you and say that participating in the Extended Extra-Homilies Program is per se commercial conduct. They couldn't say that. As a matter of fact, what she just told you is that... Can I ask you a question? Your Honor, because the listing agreement, one of the listing agreements is in the record, 77-7 says, this rental program has been designed as your last non-vacation option. Time shares are purchased for vacationing, an opportunity to enjoy special moments with family and friends. Their first choice should always be to use or exchange your vacation reservation every year, and of course you have the option of letting a friend or relative use your vacation reservation if you aren't able to do so. Your last choice should be to rent your vacation. However, we know vacations aren't always possible. If you can't use all or part of your vacation reservation this year, Extra Holidays can assist you. This is not a get-rich-quick program, and you are not excused from your financial obligations to your association, but rather this is a service provided to help prevent any vacation from going unused. Right, and certainly the program does say... Listen, the selling tool is you buy these units, these interests, because you can either use them, and if you can't use them, you can produce income with them. And Judge Jordan, to your example. It doesn't say that. It says specifically this is not a get-rich scheme, and I think your client in his deposition admitted that he was using these properties in order to make significant amounts of money, not just to exchange them when he needed to, and that's why he acquired and amassed a lot of interest in this program. Correct. That was part of his deposition, and that's why he was seeking lost profits for lost business income. And Mr. Muscara helped define what does that mean. He says no more than 50% of your interest in the program. Now, what Wyndham does is they then try to quantify what is commercial conduct, which is my original starting point. A lemonade stand. Your daughter selling lemonade to make money. Is that a commercial? Nobody would say that's commercial conduct. Selling baseball cards. Flipping a house. I think you're wrong about that on the way the public speaks. If you are flipping a house, you think that's not commercial? I buy a house for $100,000 somewhere, and I spent $100,000 renovating it, and I sell it for $400,000 to make a $200,000 profit. I'm not engaging in commercial conduct? Well, if you're going out and sort of picking houses, if you're a house flipper, yes, I would agree. I'm talking about. I would do it once. Am I engaging in commercial conduct? Let's say I have two houses. I get married. No, no, no, no. I don't want to do your hypothetical. I want to do mine. Be in the business of being a house flipper. I'm not talking about being in the business. I would not agree. Am I engaging in commercial conduct if I do what I just described? I would say no. No. I would say you're trying to make money. Why am I not engaging in commercial conduct? What do you call commercial conduct? If you're telling me that. Engaging in something for an exchange of payment. You're trying to make. I would not agree that's commercial conduct, and neither does Wyndham, by the way. Why is that not commercial conduct? What do you think commercial conduct means? Well, it's a vague term. That's the problem. No. I'm asking you what you think it means. I would say if you hold yourself out as being in the business of, in the business of selling a good or services to make a profit, in the business of. Your client was in the business of? No, he was not. Sure he was. How much money did your client make before he entered into this settlement agreement? How much money? I think he made good money. How much money did he make? I don't know exactly. I think you said he made over the years hundreds of thousands of dollars. Okay. So he's in the business. He was doing this regularly. It was the same sort of program, and he was doing it repeatedly, and he kept acquiring more interest to be able to do it more. How can that not be being in the business? Because Wyndham says he's not in the business. And here's, when Mr. Mosquera says. See, you're trying to rely on Wyndham when I'm asking you for your definition of commercial conduct. My definition. And both of you are having the devil of a time. They're trying to explain what the term means. Well, that's why the term itself is so befuddling. It is not definable in this context. Under your definition of being in the business, isn't it clear that on the summary judgment record he was clearly engaged in commercial conduct? No. Why not? To him, as long as he's. . . There are people that advertise this whole activity. He's not that person. He's a guy that figured out, boy, you can buy these things, and you can sell them and make a little money. That's not commercial conduct. Well, we know that's not because Mr. Mosquera tells him. We know it's not because they allow people. Judge, if I may, on your example. You have a bunch of points. You figure out that, boy, I can go grab a week in Maui, and I've figured out this, like, the height of the, you know, whatever's happening there, and you get that reservation. Now you put it in the market to figure out how much money can we make with this, and I entrust it to the Wynton Program. You all sell this. Make a lot of money, please. Counsel said they may not sell it all, but they may sell it and make a huge profit. You're hoping they make a big profit. Is that commercial conduct? No. Sure it is. Well, not according to them because they say it's prohibited. That is just. . . I'm not asking about them. I'm asking you. I think commercial conduct, according to what they told them, is don't advertise, don't get out there and promote. If you want to buy these things and if you can use them, great. We'll sell them to some extent. They're in. They don't put any limits on it. They're in line. So your client could have gone out the day after signing this agreement, purchased a hundred more interest, and started doing the same thing that he was doing that led to the settlement agreement? No. That's not what I'm saying. Okay, why not? What would have prevented him from doing that? What understanding of his about commercial conduct would have stopped him? He said, I'm supposed to curtail what I'm doing, which he did. He gave you half of his units. Yeah, but I'm telling you now that the day after his agreement, he goes out and he buys ten more properties, and then he starts doing the same thing he was doing before. Is he engaged in commercial conduct? Well, I would still say, I don't know what that means. He certainly is engaged. Your Honor, he's engaged. Mr. Berg, Mr. Berg, I'm not being difficult with that question. It's a pretty simple one. If your client did exactly what the agreement was meant to curtail him from doing, is he engaged in commercial conduct? He would certainly be. He buys another 50 properties, and he starts doing the same thing that he was doing that led to this settlement agreement. Is he engaged in commercial conduct? I would phrase it this way to get the same answer, which is he would be violating the spirit of what he was supposed to, which is curtail his activities, which he did. Now, is that commercial conduct? He didn't believe it was. I'm not asking for his state of mind. I think it depends. If you define commercial conduct as selling an interest to make money, then it certainly would be. You're trying to ask me for my definition. I'm asking you for your definition, and I'm not getting one. I think that that would be in violation of the agreement if he did exactly what he did before. Because? Because they wanted him to dial back the level he was using in the extra-holidays program, which is he agreed to, and he did. Commercial conduct depends on the level and the volume. That's not in the agreement either. Just like I told Ms. Tucker, Ms. Turner, this purpose, profit motive thing is not in there, and your definition is not in there either. Well, that means, I don't know what it means. They say, she added another phrase, it shouldn't be excessive. Well, what is excessive? Well, certainly. Well, you said the same thing because you said you had to curtail. So if he curtails a little bit, it's okay, but if he doesn't curtail a lot, it's not okay. So therein lies the problem, Judge. As they move forward from the agreement, what does he do? He buys two units. They process it. Okay. Then they say, you're selling units again, and then they shut it off. How many more units did he acquire after this agreement was entered into? I saw one reference that said no more than 50%. No, no, no, no, no, no. How many more interest did your client acquire after this agreement was entered into? I believe it was two. So he had a total of six afterwards? Yeah. It also, the point value depends on the price of the unit you buy. Of course. You buy a low-level one, low points. I'm not asking about points. I'm talking about interest. You bought two interests. Two more. I believe that's the case. Yes, sir. Okay. Thank you both very much. Thank you. Okay. We're in recess until tomorrow morning. All rise.